IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
————————————————————  :
                           :
MARIE CARNEY-DUNPHY,       :      HON. JEROME B. SIMANDLE
                           :
          Plaintiff,       :      Civil No. 07-3972 (JBS/AMD)
                           :
     v.                    :
                           :
TITLE COMPANY OF JERSEY &  :         OPINION
CHICAGO TITLE INSURANCE    :
COMPANY,                   :
                           :
          Defendants.      :
                           :
————————————————————  :
```

APPEARANCES:

John T. Wolak, Esq.
GIBBONS, PC
One Gateway Center
Newark, NJ 07102-5310
      Attorney for Plaintiff

Brian J. Cullen, Esq.
John M. Donnelly, Esq.
LEVINE STALLER SKLAR CHAN & DONNELLY
3030 Atlantic Avenue
Atlantic City, NJ 08401
      Attorneys for Defendant Title Company of Jersey

Michael D. Malloy, Esq.
FINESTEIN & MALLOY, LLC
26 Main Street
Chatham, NJ 07928
      Attorneys for Defendant Chicago Title Insurance Company

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

     This case emphasizes the need for persons making estate
planning arrangements to pay close attention to title insurance
policies for real property which has been voluntarily transferred
by the insured property owner to a trust.  See Shotmeyer v. New
Jersey Realty Title Ins. Co., 195 N.J. 72, 90 (2008).

This matter is before the Court upon Defendants' motions for summary judgment [Docket Items 24 and 25] and the motion of Defendant Title Company of Jersey for sanctions against Plaintiff's counsel pursuant to Rule 11, Fed. R. Civ. P. [Docket Item 33].  Plaintiff Marie Carney-Dunphy filed this lawsuit against Defendants Chicago Title Insurance Company ("Chicago Title") and Title Company of Jersey ("Jersey Title"), alleging that she was entitled to coverage under a title insurance policy underwritten by Chicago Title and issued by Jersey Title to Marie E. Carney ("Mrs. Carney"), Plaintiff's mother.  Defendants argue that Plaintiff is not entitled to coverage under the insurance policy, because she is not the named insured under the policy and because the policy lapsed, pursuant to its own terms, when Mrs. Carney voluntarily transferred her interest in the property to an irrevocable family trust years before her death.

The principal issue to be decided is whether Plaintiff, who received the property from the family trust to which Mrs. Carney had previously voluntarily transferred her interests in the property, succeeded to Mrs. Carney's interest in the property "by operation of law," as that term is used in the insurance policy. For the reasons set forth below, the Court concludes that this question must be answered in the negative.  The Court will thus grant Defendants' motions for summary judgment, although it will deny Defendant Jersey Title's motion for Rule 11 sanctions.

## II.  BACKGROUND

### A.  Facts

By deed dated May 22, 1976, Mrs. Carney, Plaintiff's late mother, purchased from Howard and Delia Jones a piece of property (the "Property") located at 7 Pelican Drive in Avalon, New Jersey for $120,000.  (Cullen Decl. Ex. 1 at 1.)  The deed contained an exception for the "[r]ights of the United States of America and the State of New Jersey in, over and along any portion of the insured premises now or formerly flowed by the tide water of Bluefish Harbor."  (Id. at 1-2.)

In the month prior to Mrs. Carney's purchase of the Property, Defendant Jersey Title, as an issuing agent for Defendant Chicago Title, (Malloy Cert. Ex. 16 at 1), issued a commitment to issue a policy of title insurance for the Property to Mrs. Carney.  (Cullen Decl. Ex. 2 at 2.)  By letter dated May 18, 1976, Jersey Title advised Mrs. Carney that it was modifying its commitment to issue an insurance policy by adding a provision excepting from title insurance coverage the "[r]ights of the United States of America and the State of New Jersey in, over and along any portion of the insured premises now or formerly flowed by the tide water of Bluefish Harbor."  (Cullen Decl. Ex. 3 at 3.)  On May 24, 1976, two days following Mrs. Carney's purchase of the Property, Jersey Title issued the title insurance policy (the "Policy") to Mrs. Carney, insuring the title to the Property

in the amount of $120,000.[1]  (Pedro Cert. Ex. D at 2.)  The
Policy contained the aforementioned exception for the riparian
rights of the United States and New Jersey.  (Id. at 3.)  A copy
of the Policy was mailed to Mrs. Carney by letter dated August 2,
1976.  (Malloy Cert. Ex. 3.)

     Schedule A of the Policy lists "Marie E. Carney" as the
"Name of Insured."  (Pedro Cert. Ex. D at 2.)  Significantly for
purposes of this lawsuit, under the Policy's provision of
"conditions and stipulations," the term "insured" is defined as
follows:

> the insured named in Schedule A, and, subject to any
> rights of defenses the Company may have had against the
> named insured, those who succeed to the interest of such
> insured by operation of law as distinguished from
> purchase including, but not limited to, heirs,
> distributees, devisees, survivors, personal
> representatives, next of kin, or corporate or fiduciary
> successors.

(Id. at 8) (emphasis added).

     In 1989, in an effort to resolve the unsettled riparian
claim against the Property, Mrs. Carney applied to the New Jersey
State Bureau of Tidelands Management (the "BTM") and the
Tidelands Resource Council for a tidelands grant for the

---

[1]  The Policy provided insurance in the amount of $120,000.
(Pedro Cert. Ex. D at 2.)  Under the Policy's "inflation
protection endorsement," the amount of insurance under the policy
was "subject to cumulative annual upward adjustments," although
"the maximum amount of insurance in force shall never exceed 150%
of the amount of insurance stated in Schedule A," (id. at 8),
which, as stated, was $120,000.

4

Property.  (Carney-Dunphy Dep. at 32; Pedro Cert. Ex. E at 1.)
On September 19, 1989, the BTM contacted Mrs. Carney to inform
her that her grant application would be approved upon her payment
of $71,680.  (Pedro Cert. Ex. F at 1.)  Mrs. Carney never made
the payment for the grant, and on June 5, 1991, the BTM canceled
her grant application.  (Pedro Cert. Ex. I at 1.)  Mrs. Carney
did not submit a claim under her title insurance policy to either
Chicago Title or Jersey Title relating to the unsettled riparian
claim.  (Pl.'s Counter-Statement of Undisputed Material Facts
("SUMF") ¶ 50.)

     On December 30, 1996, "as part of her estate plan to
minimize or avoid taxes," (Def. Jersey Title's SUMF ¶ 20; Pl.'s
SUMF ¶ 20), Mrs. Carney created an irrevocable trust, the MEC
Avalon Trust (the "Trust").  (Cullen Decl. Ex. 8 at 1.)  Under
the Trust's terms, George J. Ballas and Francis Dunphy,
Plaintiff's husband, were to serve as co-trustees of the Trust.
(Id. at 1.)  Mrs. Carney's son, Joseph Carney, and his issue were
designated as the Trust's income and residuary beneficiaries.
(Id. at 2.)  By its terms, the Trust was "irrevocable," with Mrs.
Carney having "relinquish[ed] absolutely and forever all
possession or enjoyment of, or the right to the income from, this
Trust, directly, indirectly, or constructively."  (Id. at 11.)

     On December 30, 1996, the same day the Trust agreement was
executed, Mrs. Carney executed a deed which transferred a twenty-

five percent interest in the Property to the Trust.  (Cullen
Decl. Ex. 10 at 1.)  By deeds dated April 15, 1997 and December
31, 1998, Mrs. Carney transferred a second and third twenty-five
percent interest in the Property to the Trust, (Cullen Decl. Exs.
11 and 12), and by deed dated January 19, 1999, Mrs. Carney
transferred her remaining interest in the Property to the Trust.[2]
(Cullen Decl. Ex. 13.)  The Trustees did not obtain a new title
insurance policy on the Property at any time.  (F. Dunphy Dep. at
18.)

Nine months after Mrs. Carney had transferred the remainder
of her interest in the Property to the Trust, Mrs. Carney, Joseph
Carney, Plaintiff, and other family members entered into a
"Family Settlement Agreement."  (Cullen Decl. Ex. 15 at 1.)
Under the terms of this agreement, Joseph Carney agreed to
relinquish his and his sons' interest in the Trust and to have
the Property transferred to Plaintiff, and Plaintiff agreed to
transfer the entirety of her interest in the family business,
Carney's, Inc., to Joseph.  (Id. at 2-3.)  Thereafter, between
September 1999 and December 1999, Plaintiff transferred the
remainder of her shares of Carney's, Inc., to Joseph, (Cullen
Decl. Ex. 16 at 1), the Trust was terminated, (Cullen Decl. Ex.

---

[2]  Each of the deeds transferring interest in the Property
from Mrs. Carney to the Trust included an exception for the
riparian rights of the United States and New Jersey described
above.  (Cullen Decl. Exs. 10-13.)

17 at 1), and, by deed dated December 28, 1999, the Trust's co-trustees transferred the Property to Plaintiff.[3]  (Cullen Decl. Ex. 19 at 1.)  Nothing in the record suggests that Plaintiff obtained a new title insurance policy on the Property following this transfer.

Mrs. Carney died on January 14, 2002, nearly three years after she had transferred the remainder of her interest in the Property to the Trust.  (Carney-Dunphy Dep. at 14.)  After she obtained title to the Property, Plaintiff decided to prosecute the tidelands grant and satisfy New Jersey's claim against the Property.  Plaintiff commenced efforts to obtain coverage under the Policy in October 2002 when she first contacted Jersey Title by telephone about the tidelands grant. (Id. at 70-72.) According to Plaintiff, Jersey Title informed her that she was not entitled to coverage under the Policy  (Id. at 72.)

In December 2004, Plaintiff wrote to Chicago Title to assert a claim under the Policy with respect to New Jersey's riparian rights.  (Rini Cert. Ex. A at 1.)  In her letter to Chicago Title, Plaintiff stated that "the property was owned by my mother, who died, and which I inherited."[4]  (Id.) (emphasis

---

[3]  As with all prior deeds to the Property reviewed herein, the December 28, 1999 deed included an exception for the riparian rights of the United States and New Jersey.  (Cullen Decl. Ex. 19 at 4.)

[4]  Plaintiff repeated this misrepresentation about having "inherited" the Property in the grant application she submitted

added).  In response to Plaintiff's letter, on June 28, 2005,

Chicago Title wrote a letter to the BTM, a copy of which was sent

to Plaintiff, in which Chicago Title stated that it would be

submitting a tidelands grant application on Plaintiff's behalf.

(Pedro Cert. Ex. R at 1.)  BTM subsequently processed the grant

application, (Rini Cert. at ¶ 9), and, in its March 28, 2007

letter, Chicago Title informed Plaintiff that it would "tender[]

payment of the policy amount of $120,000, plus an additional

$60,000 adjustment, for a total of $180,000, which represents the

maximum of the 150% of the policy amount,"[5] upon Plaintiff's

providing Chicago Title with "proof that Ms. Carney-Dunphy is the

sole heir of her mother's estate, or the sole distributee under

her mother's will."  (Rini Cert. Ex. F at 1.)  Plaintiff provided

no such proof, and Chicago Title did not tender payment.

**B.   Procedural History**

Plaintiff commenced this action on August 21, 2007, naming

Chicago Title and Jersey Title as Defendants.  The Complaint

[Docket Item 1] seeks a declaratory judgment against both

Defendants regarding the scope of coverage under the Policy

---

to the BTM.  (Rini Cert. Ex. at 4.)  Additionally, in the
Complaint, Plaintiff again alleges that she "inherited" the
Property.  (Compl. ¶ 31.)  As the preceding summary makes plain,
Plaintiff did not inherit the property; Mrs. Carney transferred
it to the Trust, and the trustees transferred it to Plaintiff
pursuant to the family settlement agreement, all prior to Mrs.
Carney's death.

[5]  See Note 1, supra.

(Count I); asserts claims for breach of contract and breach of
the covenant of good faith and fair dealing against both
Defendants (Counts II, III, IV, and V); and asserts a claim
pursuant to the New Jersey Insurance Trade Practices Act,
N.J.S.A. 17:29B-1, et seq. (Count VI).  Following discovery,
Defendants filed separate motions for summary judgment [Docket
Items 24 and 25], and Defendant Jersey Title moved for sanctions
against Plaintiff's counsel pursuant to Rule 11, Fed. R. Civ. P.
[Docket Item 33].

**III. DISCUSSION**

The Court addresses Defendants' motions for summary judgment
and Defendant Jersey Title's motion for sanctions in turn below.
As the following discussion makes clear, the Court will grant
Defendants' motion for summary judgment, but will deny the motion
for Rule 11 sanctions.

**A.   Defendants' Summary Judgment Motions**

1.   <u>Standard of Review</u>

Summary judgment is appropriate when the materials of record
"show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a
disputed issue of material fact, the court must view the evidence
in favor of the non-moving party by extending any reasonable
favorable inference to that party; in other words, "the nonmoving

9

party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).

"Under New Jersey law, the interpretation of an insurance contract on undisputed facts is a question for the court to decide as a matter of law and can be the basis for summary judgment." <u>Wimberly Allison Tong & Goo, Inc. v. Travelers Property Cas. Co.</u>, 559 F. Supp. 2d 504, 510 (D.N.J. 2008) (internal quotations and citations omitted); <u>see also</u> <u>Sealed Air Corp. v. Royal Indem. Co.</u>, 404 N.J. Super. 363, 375 (N.J. App. Div. 2008) (interpretation and construction of insurance contracts "are matters of law for the court").

    2.   <u>Analysis</u>

The central issue that is the focus of the parties' motion practice, and upon which all of Plaintiff's claims turn, is whether Plaintiff succeeded to Mrs. Carney's interest in the Property "by operation of law," as that term is used in the insurance policy. (Pedro Cert. Ex. D at 8.) As the Court explains, <u>infra</u>, if Plaintiff did not succeed to her mother's interest in the property by operation of law, then she is not an "insured" within the terms of the Policy, and is not entitled to the coverage under the Policy she seeks herein. For the reasons now explained, the Court concludes that Plaintiff did not succeed

10

to Mrs. Carney's interest by operation of law, rendering
unsustainable the claims she seeks to assert pursuant to the
Policy.

The New Jersey Supreme Court[6] recently explained the purpose
and structure of title insurance policies in the following terms:

> A title insurance policy is a contract that protects a
> landowner against loss caused by defective title to the
> land.  See Sandler v. N.J. Realty Title Ins. Co., 36 N.J.
> 471, 478-79 (1962); Joyce Palomar, Title Insurance Law,
> § 1:8 (2007).  To recover under the policy, the defect
> must have existed at the time the insurance was
> purchased.  11 Couch on Insurance 3d, § 159:5 (1998).  In
> that sense, title insurance covers "a state of ownership
> at a specific point in time."   Ibid.   In order to
> purchase title insurance, buyers make a one-time premium
> payment at the time of purchase.   The policy then
> continues in force indefinitely until the insured divests
> title or alters title in a way that terminates coverage.
> Ibid.

Shotmeyer, 195 N.J. at 82.

As is the case with other types of insurance policies, id.,
title insurance policies "are adhesion contracts, [and so] courts
must assume a particularly vigilant role in ensuring their
conformity to public policy and principles of fairness."
Wimberly, 559 F. Supp. 2d at 510 (quoting Voorhees v. Preferred
Mut. Ins. Co., 128 N.J. 165, 175 (1992)).  That is, "[w]hen an
ambiguity exists, courts should interpret the contract in
accordance with the reasonable expectations of the insured."
Shotmeyer, 195 N.J. at 82 (internal quotations and citations

---

[6]  The parties agree that New Jersey law governs the
resolution of their dispute.

omitted).  "However, courts must guard against rewriting policies
in favor of the insured under the guise of interpreting a
contract's reasonable terms," and "[i]n the absence of ambiguity,
an insurance policy should be interpreted according to its plain,
ordinary meaning."  Id. at 82-83 (citations omitted).  Just as a
court "cannot write for the insured a better policy of insurance
than the one purchased," Wimberly, 559 F. Supp. 2d at 510
(internal quotations and citations omitted), courts are likewise
unable to write into an insurance policy a more expansive
definition of "insured" than the policy's terms provide.
See Shotmeyer, 195 N.J. at 82-83.

     As the Court explained, supra, the Policy at issue in this
matter identifies Plaintiff's mother, "Marie E. Carney," in
Schedule A as the "Name of Insured," and under the Policy's
"conditions and stipulations," the term "insured" is defined as
follows:

       the insured named in Schedule A, and, subject to any
       rights of defenses the Company may have had against the
       named insured, those who succeed to the interest of such
       insured by operation of law as distinguished from
       purchase including, but not limited to, heirs,
       distributees, devisees, survivors, personal
       representatives, next of kin, or corporate or fiduciary
       successors.

(Pedro Cert. Ex. D at 2, 8.)

     In discussing this exact contractual provision, and, in
particular, its restriction of an "insured" to the named insured
and "those who succeed to the interest of such insured by

12

operation of law," id., the New Jersey Supreme Court recently

explained:

> As the Appellate Division noted, courts generally have found that when title is passed by "operation of law," the change is automatic or involuntary. See Egner v. Egner, 183 N.J. Super. 326, 331, 443 A.2d 1104 (Ch. Div.) (distinguishing between voluntary lifetime transfers and involuntary transfers occurring by operation of law in context of mortgage agreements), aff'd, 185 N.J. Super. 1, 447 A.2d 182 (App. Div. 1982); Pioneer Nat'l Title Ins. Co. v. Child, Inc., 401 A.2d 68, 70 (Del. 1979) (noting definition of "operation of law" as "the manner in which a party acquires rights without any act of his own"); see also United States v. Seattle-First Nat'l Bank, 321 U.S. 583, 587-88 (1944) ("We must look only to the immediate mechanism by which the transfer is made effective.  If that mechanism is entirely statutory, effecting an automatic transfer without any voluntary action by the parties, then the transfer may truly be said to be 'wholly by operation of law.'").  A voluntary transfer of assets from a dissolved corporation, pursuant to a plan of liquidation, has also been found to occur by operation of law.  Historic Smithville Dev. Co. v. Chelsea Title & Guar. Co., 184 N.J. Super. 282, 291-93 (Ch. Div. 1981), aff'd, 190 N.J. Super. 567 (App. Div. 1983).

Shotmeyer, 195 N.J. at 87-88 (emphasis added).[7]  Other courts

reviewing this same contractual language and evaluating the

meaning of the term "by operation of law" have likewise

highlighted the difference between voluntary lifetime transfers

and involuntary or automatic transfers, concluding that the

former do not occur by operation of law.  See Pioneer Nat'l Title

---

[7]  As the New Jersey Supreme Court further noted in Shotmeyer, "[t]his case highlights the need for special care when transferring assets as part of an estate plan.  Particular attention must be given to title insurance policies when real property is transferred."  Shotmeyer, 195 N.J. at 90.

13

Ins. Co. v. Child, Inc., 401 A.2d 68, 71 (Del. 1979) (recognizing that "events caused by the voluntary action of the parties" do not occur by operation of law); see also Kwok v. Transnation Title Ins. Co., 89 Cal. Rptr. 3d 141, 148 (Cal. App. 2d Dist. 2009); Lawyers Title Ins. Co. v. Cae-Link Corp., 45 F.3d 426 (4th Cir. 1995) (citing Pioneer approvingly for the proposition that "the term 'operation of law' [does] not encompass transactions that required the voluntary acts of the parties to effect a particular transaction").

Hence, in Shotmeyer, the New Jersey Supreme Court determined that the transfer of property from a general partnership to a limited partnership did not occur by operation of law because the transfer was voluntarily undertaken by the officers of both entities and because both entities continued to exist independently following the transfer. Shotmeyer, 195 N.J. at 88. Similarly, and closer to the facts presented in this case, in Pioneer, the Delaware Supreme Court explained that when a nonprofit corporation transferred property to an individual, who later transferred the property to a separate nonprofit corporation, neither of these transfers occurred by operation of law, because "[e]very one of the transactions . . . was voluntary on the part of the individual and corporate persons involved."[8]

---

[8] As in this case, the transfers in Pioneer were made in order to reduce the tax burdens on the parties to the transactions. The court explained that while this may be "a

Pioneer, 401 A.2d at 71 (cited approvingly in Shotmeyer, 195 N.J. at 87-88).  And, under almost identical facts to those presented here, the Kwok court held that "[t]he transfer of property by an insured into a family trust is a voluntary act and not one that arises by operation of law."  Kwok, 89 Cal. Rptr. 3d at 148.

Applying this authority to the facts of this case, the Court concludes that Plaintiff did not succeed to her mother's interest in the Property by operation of law, and that she is, therefore, not an insured within the meaning of the Policy.  Contrary to her representations to Chicago Title and the BTM, see Note 4, supra, Plaintiff did not "inherit" the Property from her mother.  See Black's Law Dictionary 787 (7th ed. 1999) (defining "inheritance" as "Property received from an ancestor under the laws of intestacy" and "Property that a person receives by bequest or devise").[9]  Rather, Mrs. Carney, through a series of voluntary lifetime acts, transferred the entirety of her interest in the Property to the Trust, and subsequently, pursuant to the Family Settlement Agreement, the beneficiary of the Trust, Joseph Carney, voluntarily transferred the Property to Plaintiff in

_____

perfectly permissible objective," it does not enlarge the definition of "insured" under the terms of the insurance policy. 401 A.2d at 71.

[9]  Receiving property by "bequest or devise," of course, requires that the property be given by a will.  See Black's Law Dictionary 152, 463 (7th ed. 1999) (defining "bequest" and "devise").

exchange for Plaintiff's shares of Carney's, Inc.[10]  As in
Pioneer, "[e]very one of the[se] transactions . . . was voluntary
on the part of the . . . persons involved." Pioneer, 401 A.2d at
71.  It is now well-established, in New Jersey and elsewhere,
that such voluntary transfers do not occur "by operation of law."
See Shotmeyer, 195 N.J. at 87-88; Pioneer, 401 A.2d at 71.  "The
transfer of property by an insured into a family trust is a
voluntary act and not one that arises by operation of law," Kwok,
89 Cal. Rptr. 3d at 148, and the subsequent transfer by the
Trust's beneficiary of the Property to Plaintiff in exchange for
stock in the family business likewise was voluntary and did not
occur by operation of law.  Shotmeyer, 195 N.J. at 87-88;
Pioneer, 401 A.2d at 71.

       Plaintiff's arguments to the contrary are unpersuasive.
Plaintiff relies almost exclusively upon Historic Smithville Dev.
Co. v. Chelsea Title & Guar. Co., drawing the Court's attention
to that case's holding that the distribution of assets from a
dissolved corporation pursuant to a liquidation plan takes place
by operation of law, and suggesting that this holding is relevant
to the present matter.  184 N.J. Super. 282, 290-93 (Ch. Div.
1981).  Historic Smithville is easily distinguished from the

_____

       [10]   Indeed, Mrs. Carney, from whom Plaintiff purports to
have "inherited" the Property, was not only alive at the time
Plaintiff acquired title to the Property, but was herself a party
to the Family Settlement Agreement pursuant to which Plaintiff
received the Property.

facts here.  As the <u>Historic Smithville</u> court itself explained:

> [T]ransfers in dissolution, pursuant to a statute, in
> cases where, as here, there are no creditor problems, are
> the <u>perfunctory discharge of a legal obligation</u> to invest
> shareholders with assets to which they are entitled.
> Such action is <u>required by law</u> and may therefore be said
> to be "by operation of law."

<u>Id.</u> at 290 (emphasis added).  Mrs. Carney's voluntary transfer of

her interest in the Property to the Trust manifestly was not the

perfunctory discharge of any legal obligation, and she certainly

was not required by law to transfer title to the Property in the

manner she elected voluntarily to undertake.  To the contrary,

Mrs. Carney transferred the Property to the Trust "to minimize or

avoid taxes," (Def. Jersey Title's SUMF ¶ 20; Pl.'s SUMF ¶ 20),

which, although it can be a "permissible objective," <u>Pioneer</u>, 401

A.2d at 71, certainly is not one that she was "required by law"

to pursue.  <u>Historic Smithville</u>, 184 N.J. Super. at 290.

<u>Historic Smithville</u> is, in short, restricted to its unique

factual setting – the distribution of assets pursuant to a

statutorily governed plan for corporate dissolution – and affords

no support to Plaintiff.

  Plaintiff, pointing to the Policy's recognition that

"fiduciary successors" and "distributees" of the insured "succeed

to the interest of such insured by operation of law," (Pedro

Cert. Ex. D at 8), next constructs a tortured argument as to why

she should be entitled to coverage under the Policy.  The

argument proceeds as follows: because "trustees are defined by

statute as fiduciaries," the Trust created by her mother "should
be considered a 'fiduciary successor' under the Policy because it
was at all times acting in a fiduciary capacity for Mrs. Carney
and the trust beneficiaries."  (Pl.'s Opp'n Br. at 10.)
Therefore, Plaintiff concludes, because a "trust distribution [is
defined as] the cash or other property paid or credited to a
trust beneficiary . . . the term 'distributee' should be
construed liberally to include Ms. Dunphy, who received the
Property as a distribution from the Trust upon termination of the
Trust."  (Id.) (some internal quotations and citations omitted).

     This argument falters at several critical points.  First,
the Trust was not a "fiduciary successor."  (Pedro Cert. Ex. D at
8.)  By providing that "corporate or fiduciary successors"
"succeed to the interest of [the] insured by operation of law,"
(id.), the Policy patently does not extend coverage to any
recipient of the insured's property interest that happens to be a
corporation or a fiduciary.  In Pioneer, for example, the
nonprofit corporation to which an insured property was
voluntarily transferred by an individual was not a "corporate . .
. successor" simply because it received the insured property and
was a corporation.  Pioneer, 401 A.2d at 71.  Rather, "corporate
successor" and "fiduciary successor" are legal terms with
specific, settled definitions.  A "fiduciary successor," more
frequently called a "successor fiduciary," is a "fiduciary who is

18

appointed <u>to succeed or replace a prior one</u>."  Black's Law Dictionary 640 (7th ed. 1999) (emphasis added); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Fernandez v. K-M Industries Holding Co., Inc.</u>, 585 F. Supp. 2d 1177, 1184 (N.D. Cal. 2008) (discussing fiduciary successors). In this case, the Trust did not succeed or replace any <u>prior</u> <u>fiduciary</u> – it simply was the entity to which Mrs. Carney voluntarily transferred her interest in the Property.  The Trust thus was not a fiduciary successor.

Moreover, contrary to Plaintiff's contention that the Trust was "at all times acting in a fiduciary capacity for Mrs. Carney and the trust beneficiaries," (Pl.'s Opp'n Br. at 10), the Trust was at no time acting in a fiduciary capacity for Mrs. Carney, as is evidenced by the fact that by the Trust's terms, Mrs. Carney "relinquish[ed] absolutely and forever all possession or enjoyment of, or the right to the income from, this Trust, directly, indirectly, or constructively."  (Cullen Decl. Ex. 8 at 11); <u>see</u> Restatement (Second) of Trusts § 170(1) ("The trustee is under a duty to the beneficiary to administer the trust <u>solely in</u> <u>the interest of the beneficiary</u>") (emphasis added); <u>Matter of</u> <u>Gonzalez</u>, 262 N.J. Super. 456, 459 (Ch. Div. 1992) (fiduciary duty in valid trust is "between trustee and beneficiary").

Finally, Plaintiff was not Mrs. Carney's "distributee." Even under Plaintiff's expansive reading of the term "distributee" (which is, essentially, anyone or anything to which

something is distributed), she is not entitled to coverage under
the Policy, because she is at best a distributee of the Trust,
not of Mrs. Carney.  Because the Trust did not "succeed to the
interest of such insured by operation of law," (Pedro Cert. Ex. D
at 8), whether or not Plaintiff was a distributee of the Trust is
irrelevant.[11]

     In summary, the Court agrees with Defendants that "the title
insurance policy lapsed when the property was voluntarily
conveyed from [Plaintiff's mother] to the . . . [Trust],"
Shotmeyer, 195 N.J. at 77, and that, because Plaintiff was not an
insured within the scope of the Policy, she is not entitled to
the insurance coverage she seeks herein.  Because each of
Plaintiff's claims turns on the question of whether she is an
insured entitled to coverage under the Policy,[12] and because the

_____

     [11]  Had the Trust purchased a title insurance policy and
subsequently distributed the Property to Plaintiff, a different
question would be presented as to whether Plaintiff would be
entitled to coverage under such a policy.  As the evidence makes
unmistakably clear, the trustees did not obtain a new title
insurance policy on the Property at any time.  (F. Dunphy Dep. at
18.)

     [12]  Specifically, Plaintiff's claim for declaratory relief
is based upon her contention that she is "entitled to full
coverage and all benefits provided by the [Policy]."  (Compl. ¶
77.)  Her contractual claims likewise turn on the threshold
requirement that there be a valid contract between herself and
Defendants.  See, e.g., Video Pipeline, Inc. v. Buena Vista Home
Entm't, Inc., 275 F. Supp. 2d 543, 566 (D.N.J. 2003), aff'd, 342
F.3d 191 (3d Cir. 2003) (explaining that the first element of a
breach of contract claim is that "a valid contract existed
between plaintiff and defendant").  Finally, Plaintiff's claim
that Defendants violated the New Jersey Insurance Trade Practices

preceding analysis makes clear that she is not, the Court will grant Defendants' motions for summary judgment in their entirety.

### B.   Motion for Sanctions

Defendant Jersey Title has moved for sanctions against Plaintiff's counsel pursuant to Rule 11, Fed. R. Civ. P. According to Jersey Title, Plaintiff's counsel could not have had a reasonable, good faith basis for filing a claim seeking coverage under the Policy.  Plaintiff, arguing that the term "by operation of law" is undefined in the Policy and ambiguous, and again relying almost exclusively on the Historic Smithville case, argues that sanctions are inappropriate in this case.  Although it presents a closer question than did Defendants' motions for summary judgment, the Court will deny Defendant Jersey Title's motion for sanctions pursuant to Rule 11, Fed. R. Civ. P.

As this Court has explained:

> Fed. R. Civ. P. 11 "imposes on counsel a duty to look before leaping and may be seen as a litigation version of the familiar railroad crossing admonition to 'stop, look, and listen.'"  Lieb v. Topstone Indus. Inc., 788 F.2d 151, 157 (3d Cir. 1986).  Rule 11 requires that an attorney who submits a complaint certify that it is not

---

Act ("NJITPA"), N.J.S.A. 17:29B-1, et seq., is only sustainable if Plaintiff was entitled to coverage under the insurance contract.  Technically, the statute upon which Plaintiff relies does not allow for a private right of action.  See Pierzga v. Ohio Cas. Group of Ins. Companies, 208 N.J. Super. 40, 47 (N.J. App. Div. 1986).  While the NJITPA has been cited as a recognition of the duties owed by an insurance provider to an insured in the context of a tort claim, such a claim likewise requires that the plaintiff be "an insured," Pickett v. Lloyd's, 131 N.J. 457, 466 (1993), which Plaintiff was not.

> asserted for improper purposes (such as delay or
> harassment) and that there is a reasonable basis in fact
> and law for the claims made. <u>Leuallen v. Borough of
> Paulsboro</u>, 180 F. Supp. 2d 615, 618 (D.N.J. 2002). Rule
> 11 is intended to discourage the filing of frivolous,
> unsupported, or unreasonable claims.  The Third Circuit
> has written that "the legal standard to be applied when
> evaluating conduct allegedly violative of Rule 11 is
> reasonableness under the circumstances." <u>Ford Motor Co.
> v. Summit Motor Products, Inc.</u>, 930 F.2d 277, 289 (3d
> Cir. 1991) (citations omitted).  Reasonableness in the
> context of a Rule 11 inquiry has been defined as "an
> objective knowledge or belief at the time of the filing
> of a challenged paper that the claim was well grounded in
> law and fact."  <u>Id.</u>

<u>South Broward Hosp. Dist. v. MedQuist Inc.</u>, 516 F. Supp. 2d 370,
402-03 (D.N.J. 2007); <u>HT of Highlands Ranch, Inc. v. Hollywood
Tanning Systems, Inc.</u>, 590 F. Supp. 2d 677, 692 (D.N.J. 2008).
Furthermore, "when divining the point at which an argument turns
from merely losing to losing and sanctionable, . . . courts
[must] resolve all doubts in favor of the signer" of the
pleading.  <u>Rodick v. City of Schenectady</u>, 1 F.3d 1341, 1350 (2d
Cir. 1993) (internal quotations omitted).

The Court concludes that Plaintiff's case was "weak" and
that her attorneys may have "used poor judgment in pursuing [her]
allegations," <u>Davis v. Carl</u>, 906 F.2d 533, 537 (11th Cir. 1990),
but finds that the claims were not frivolous or completely
unreasonable such that her attorneys' pursuit of such claims
could amount to sanctionable conduct.  <u>See</u> <u>South Broward</u>, 516 F.
Supp. 2d at 402-03.  In particular, the Court recognizes that
Plaintiff's counsel placed considerable weight upon dicta in

Historic Smithville which described the "operation of law"
provision in extremely broad terms.  The Historic Smithville
court, in reasoning that voluntary transfers could take place "by
operation of law," did so expansively:

> [The policy] does not limit the terms "insured" and
> "operation of law" to strictly involuntary transferees.
> In several instances it includes in its definition of
> "insured" those who acquire title through some voluntary
> action.  For example, "devisees" are covered.  A
> "devisee" is one who acquires title to real property by
> will, and therefore by the voluntary act of the testator.
> The devise is not effective until the will is probated,
> a voluntary action very similar to the delivery and
> recording of a deed in the execution of a liquidation
> plan by the directors of a dissolved corporation . . . .
> The policy also extends coverage to "distributees."  The
> word is very broad.  It may include persons to whom real
> property is distributed by an executor, a possible
> discretionary act, and those to whom a corporation in the
> process of dissolution distributes its real estate.  The
> policy does not limit the term.  A "fiduciary successor"
> is described as an "insured."  There are many fiduciary
> relationships.    Partners   stand   in   a   fiduciary
> relationship to each other.  A new partner who is
> substituted for another may be a "fiduciary successor."
> If so, the substitution, though not in any sense "by
> operation of law," would not disturb coverage even though
> a 99% interest in the partnership assets changed hands.
> "Corporate  successors"  are  covered.     This  is  loose
> language.  It would seem to encompass all who step into
> the  shoes  of  the  corporation,  who  become  its
> "successors."

Historic Smithville, 184 N.J. Super. at 289-90 (some internal
quotations and citations omitted).

As the Court explained, supra, notwithstanding the breadth
of the Historic Smithville court's language in the cited passage,
its holding is limited to the factual setting of a statutorily
governed post-dissolution distribution of corporate assets; such

a conclusion, the Court finds, is mandated by the New Jersey Supreme Court's subsequent conclusion in Shotmeyer that voluntary transfers outside of this setting do not occur by operation of law.  See Shotmeyer, 195 N.J. at 87-88.  However, taking account the expansive interpretation of the term "by operation of law" in Historic Smithville, and the fact that the New Jersey Supreme Court cited Historic Smithville approvingly for the proposition that a "voluntary transfer of assets from a dissolved corporation, pursuant to a plan of liquidation, has also been found to occur by operation of law" in Shotmeyer, id., this Court does not agree with Jersey Title that Plaintiff's claims are so patently unwarranted by "a good faith argument for the extension . . . of existing law," Willy v. Coastal Corp., 503 U.S. 131, 135 n.1 (1992), as to justify the imposition of sanctions.  While Plaintiff's claims lack merit and her arguments are unpersuasive, they were at least arguably based upon a good faith (if overly ambitious) reading of expansive language in Historic Smithville. See Fox v. Acadia State Bank, 937 F.2d 1566, 1569 (11th Cir. 1991) ("Rule 11 was not intended to chill innovative theories and vigorous advocacy . . .") (internal quotations and citations omitted); Smith By and on Behalf of Smith v. Philadelphia School Dist., 679 F. Supp. 479, 484 (E.D. Pa. 1988) (same).  For these reasons, and because under Rule 11 close calls should be resolved in favor of the non-movant, see Rodick, 1 F.3d at 1350, the Court

24

will deny Defendant Jersey Title's motion for Rule 11 sanctions.

**IV.   CONCLUSION**

For the reasons discussed above, the Court will grant Defendants' motions for summary judgment, and will deny Defendant Jersey Title's motion for sanctions.  The accompanying Order is entered.


**June 30, 2009**                                    **s/ Jerome B. Simandle**
Date                                                JEROME B. SIMANDLE
                                                    United States District Judge

25